230 A.2d 254.

GLASS-TITE INDUSTRIES, INC. *vs.* SPECTOR FREIGHT SYSTEMS, INC.

JUNE 2, 1967.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J.   This is an action of trespass on the case for negligence.   It was tried before a justice of the superior court, sitting without a jury, who rendered a decision for the defendant.   The case is before us on the plaintiff's exceptions to the decision and to certain evidentiary rulings.

The plaintiff is a Rhode Island corporation having its principal place of business in Providence.   It is engaged in the manufacturing of certain parts which find wide use in the electronic industry throughout this country.   The defendant is a trucker which, as a common carrier engaged in interstate commerce, transports goods between various

points in the continental United States. This suit was brought to recover damages for the loss of certain goods of plaintiff which had been carried by defendant from Chicago, Illinois, to Providence. These goods had been rejected by one of plaintiff's customers in Phoenix, Arizona, and were returned via Chicago to plaintiff. Hereinafter we shall refer to plaintiff's customer as Motorola.

The record discloses that in 1959 Motorola had placed an order with plaintiff for one million "Feed Thrus" which were to be made to the specifications of Motorola. A Feed Thru is an electronic device having an outside metal ring which is held to an inside metal conductor (sometimes referred to as a pin) by a piece of glass which has been fused to the metal by the application of intensive heat. To the untrained eye the conductor looks like an ordinary straight pin and measures approximately one-half inch in length. The conductor protrudes through both sides of the outside ring which measures approximately one quarter of an inch in height and diameter. The Feed Thru has wide application in both civilian and military endeavors.

As a part of filling its order, plaintiff shipped six cartons of these items to the Semi-Conductor Products Division of Motorola in Phoenix. The number of parts sent in this shipment amounted to approximately 317,000. Prior to being placed in the cartons, the Feed Thrus were packed in polyethylene bags with a certain number thereof in each bag. It is unclear from the testimony as to the exact amount in each bag since sometimes it is referred to as 100 and sometimes as 3,000. The bags had been treated with dry nitrogen and then hermetically sealed. This process, the court was told, was used to insure that the parts would be free from moisture on their trip west and that they would arrive at their destination free from rust. Upon the order's arrival in Phoenix, Motorola took a selective sampling of the goods and tested them. Notwithstanding plaintiff's

precautions, the shipment was rejected because the tests showed that some of the items did not comply with Motorola's specifications and 90 per cent of the shipment was rusty.

Consequently, Motorola shipped the six cartons back to plaintiff by delivering them to a motor carrier on two different occasions under three separate bills of lading. The first bill was executed on July 18, 1960, and covered one carton. On July 21, 1960, two other bills were executed. One bill covered four cartons while the remaining carton was listed on the other document. The goods returned were for "credit only" even though there was testimony that the deficiencies which allegedly caused the rejection could have been easily corrected. There was evidence that in the past, deficiencies in returned goods had been rectified by plaintiff, the materials were reshipped and accepted by Motorola.

The defendant delivered five of these cartons to plaintiff on August 1, 1960. The plaintiff's chief shipping clerk signed two delivery receipts which stated that the five cartons were received in good condition. The sixth and final carton arrived in Providence on August 10, 1960. This time, however, the clerk signed the delivery receipt and indicated thereon that this carton had been received in a damaged condition. Records kept by the clerk, which were introduced into evidence, corroborated the information listed on the delivery receipts.

On September 21, 1960, plaintiff filed a claim with defendant for $7,925. This amount was given by plaintiff's witnesses as the full value of all the Feed Thrus at the time of their return by Motorola. In its claim, plaintiff alleged that all the Feed Thrus had been crushed and their pins bent to such an extent that it would be impossible to repair them. In a letter which accompanied its claim, plaintiff's plant manager stated that all six cartons had been completely "tattered" and this condition indicated to him

that the goods had been completely mishandled in transit. He pointed out that there was a discrepancy between the amount of goods shipped and those returned but he said this was an error on Motorola's part.

One of defendant's claim agents testified that he had examined the cartons in September 1960 at plaintiff's premises. He observed that only one carton was opened and that several of the polyethylene bags therein were ruptured so that many of the Feed Thrus lay "loose" in the carton. Upon opening the other cartons, he found the polyethylene bags were intact. He emphasized that five other cartons were not crushed.

A former vice-president of plaintiff who was in overall charge of its manufacturing operations in 1960, told the court that he was at a loss to explain the appearance of the rust in the shipment. At one point in his testimony he attributed its presence to the polyethylene bags having been ruptured somewhere en route to Phoenix. His insistence that the Feed Thrus were properly processed when they were placed in the bags was modified somewhat by his later explanation that the rust could have been occasioned by some oxygen which might have remained in the bags after they were sealed. He did, however, accept full responsibility for the rejection by Motorola. In regard to plaintiff's failure to comply with Motorola's specifications, the witness classified this factor as a "dimensional problem." He stated that, depending on the errors, some are correctable but most of them are not. He did not know what the dimensional problem in this group was and could not recall if the bent "pins" which plaintiff complains of here was one of these defects.

A representative of Motorola who in July 1960 was one of its buyers testified in a deposition which was made part of the record. In stating that the goods were in good condition when they were delivered to the initial carrier in

Phoenix, he justified this conclusion on his assumption that in common practice a carrier would not accept anything that was not in good condition. He did say that Motorola would not accept damaged material. It was clear that the inspection and rejection of the instant shipment was not performed by his division and that the "Discrepant Material Reports" from which he testified were prepared by another division of Motorola. His testimony was further neutralized by his statement that when he testified that the goods were in "good condition" in Phoenix, he meant that the "packaging" was in good condition.

Throughout its brief and argument, plaintiff expounds the correct principles of law which govern the respective rights of the parties hereto. Its difficulty, however, is that the trial justice in his decision made certain findings against plaintiff, based on conflicting evidence which in our opinion precludes recovery. It is fitting that at this juncture we consider the rules of law involved in the instant case.

It is undisputed that federal law and federal decisions are to be applied to the facts which were elicited in the trial below. We believe that the determinative issue is whether plaintiff established a prima facie case of liability. The liability of a common carrier delivering property in interstate shipments is governed by the Carmack Amendment to the Interstate Commerce Act which makes the delivery carrier liable "for the full actual loss, damage, or injury" which it causes to the property. 49 U.S.C., §20(11). This provision codifies the common-law rule that a carrier is liable "* * * for all damage to the goods transported by it, unless it affirmatively shows that the damage was occasioned by the shipper, acts of God, the public enemy, public authority or the inherent vice or nature of the commodity." *Secretary of Agriculture* v. *United States*, 350 U. S. 162, 76 S.Ct. 244, 100 L.Ed. 173; *Galveston, Harrisburg & San Antonio Ry.* v. *Wallace*, 223 U. S. 481, 32 S.Ct. 205,

56 L.Ed. 516. A shipper establishes a prima facie case by showing delivery of the shipment to the carrier in good condition, its arrival in a damaged condition and the amount of the damages. *Chesapeake & Ohio Ry.* v. *Thompson Mfg. Co.,* 270 U. S. 416, 46 S.Ct. 318, 70 L.Ed. 659; *Harris Truck Lines, Inc.* v. *Cherry Meat Packers, Inc.,* 313 F.2d 864; *United States* v. *Gulf Mobile & Ohio R.R.,* 259 F.Supp. 704. Once plaintiff establishes a prima facie case "* * * the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." *Missouri, Pacific R.R.* v. *Elmore & Stahl,* 377 U. S. 134, 84 S.Ct. 1142, 12 L. Ed.2d 194.

It is clear, after reviewing the above-enumerated principles, that before defendant carrier is made to come forward and produce evidence showing its freedom from fault and that the loss was due to one of the aforementioned exceptions, it is plaintiff's burden to prove by the preponderance of the evidence the elements which constitute its prima facie case, to wit: (1) delivery of the shipment in good condition; (2) the subsequent damage shown on receipt in Providence; and (3) the amount of the loss occasioned by the damage. In its brief and argument before us, plaintiff concurred in this proposition of law. As stated in *Valco Mfg. Co.* v. *C. Rickard & Sons, Inc.,* 22 N.J.Super. 578, 92 A.2d 501, the law does not permit speculation or conjecture on this subject. The right of defendant to have plaintiff establish the elements which form the basis of liability is a fundamental one.

An examination of the trial justice's decision shows that plaintiff did not succeed in persuading him that these goods were in good order and condition when they left Phoenix or that they arrived in Rhode Island damaged. The plaintiff not having satisfied the court in these areas, it cannot prevail.

It is clear, after reading the decision of the superior court, that the inconsistent conduct of plaintiff and the absence of certain tangible evidence cast such a pall of doubt over plaintiff's allegations as to the actual condition of the goods that the trial justice did not believe them. He laid particular stress on plaintiff's failure to produce in court any large quantity of the alleged damaged goods or the "tattered" cartons. Of the 317,000 allegedly bent Feed Thrus which were part of the returned July shipment, only one was produced in court. It is an exhibit here and, strangely, the conductor or pin appears, at least to the naked eye, to be straight and not bent. It was noted by the court that no pictures of either the damaged goods or cartons were produced. Although plaintiff's quality control division had prepared reports on the rejected goods, these items were conspicuous by their absence at the trial. While it is true that plaintiff claimed that the Feed Thrus, cartons and reports were either lost or destroyed, it was up to the trial justice to accept or reject this explanation.

The judge below pointed to the differences between plaintiff's claim letter sent to defendant wherein it states that all the cartons were split open and the statements to the contrary found on the two delivery slips which bear the signature of plaintiff's chief shipping clerk. The justice below was of the opinion that the damage to the single carton occurred because it was not completely filled when it left Phoenix. He based this conclusion on the evidence which showed a discrepancy between the amount of Feed Thrus shipped to Motorola and those returned to plaintiff.

In his effort to determine the actual condition of the Feed Thrus, the trial justice was concerned over the absence in court of any correspondence that might have passed between plaintiff and Motorola over the rejected shipment. The court pointed to a statement which appeared on the bottom of each of these Discrepant Material Report forms

which were sent to plaintiff by Motorola. It expressly directed plaintiff to acknowledge its receipt and inform Motorola what steps had been taken to prevent the recurrence of the noted discrepancies in any future shipments. The general manager of plaintiff at the time of the trial admitted that there were factory record files concerning these goods which were not in court.

From the facts presented in this case, we believe that plaintiff cannot establish the good condition of the goods in Phoenix from the bills of lading issued by the initial carrier. Each of these documents is a straight bill of lading as prescribed by the Interstate Commerce Commission and is a receipt "for the property described below in apparent good order except as noted (contents and condition of contents of packages unknown) * * *."

We believe that the best explanation of the import of this language is found in *Hoover Motor Express Co.* v. *United States*, 262 F.2d 832. There the bill of lading which covered some large machines read "in apparent good order * * * (contents and condition of packages unknown)." The machines had been crated and upon arrival at their destination they were found to be damaged and one of the crates had a hole in it. The court held that the bill of lading was not proof as to the condition of the contents of the crates because the parenthetical phrase constituted an express limitation on any acknowledgment by the carrier that the goods were received in good order.

In *Tuschman* v. *Pennsylvania R.R.*, 230 F.2d 787, a statement on a bill of lading that the goods were received in apparent "good order" was construed to be prima facie evidence of the good order of only those goods which were open for inspection and visible. While there exists a difference of opinion as to the nature and extent of evidentiary assistance given to a shipper who receives a bill of lading with language similar to that used herein, we believe *Hoo-*

*ver* sets forth the better rule. An interesting exchange of views in this area may be found in 33 A.L.R.2d §3, p. 872, together with its later case service.

In *Hoover* the goods being crated were not visible and open to inspection. The shipper's claim for damages was therefore denied. So, too, here, the Feed Thrus were in cartons and not visible to the shipper. Their condition not being apparent and observable, plaintiff shows nothing so far as the condition of the contents of the cartons is concerned by these bills of lading.

As we said in *Williams* v. *Rhode Island Hospital Trust Co.*, 88 R. I. 23, and repeated in *Arden Eng'r Co.* v. *E. Turgeon Const. Co.*, 97 R. I. 342, 197 A.2d 743, it is the function of the trier of facts to draw the inferences from the record before him. This is the trial justice's business and we will not interfere if his inferences are reasonable—be they positive or negative. Here, plaintiff had the burden of proof to show by the preponderance of the evidence that the goods were in better condition when they were shipped than when they were received. Once it failed in this burden, defendant did not have to come forward with any evidence. We have examined the transcript and the exhibits in the light of the principles of law applicable thereto and we cannot say that the inferences and conclusions of the trial justice were unreasonable or clearly wrong.

The plaintiff points to certain alleged misstatements of evidence and misidentification of exhibits made by the trial justice in rendering his decision. We have carefully examined these alleged errors and find they are minor discrepancies which in no way negate the basis for his findings. His decision shall stand.

The sole relevant exception remaining, taken by plaintiff, is to the introduction of the two delivery receipts signed by its chief shipping clerk on August 1, 1960, wherein he acknowledged that the five cartons were received in

good order. The documents were part of defendant's records and were produced by it in court. The plaintiff's exception is based on its contention that these two documents are copies and not originals. It does not question the genuineness of the clerk's signature but contends that the admission of these documents violates the best evidence rule.

It is true that the best evidence rule is intended to bar the admission of any evidence which, by its nature, indicates that there is other evidence more direct and conclusive. This rule, however, which prohibits the use in evidence of copies of documents when they themselves are available as proof, does not apply to a document or writing which is executed in duplicate or multiple form. Where several duplicates of a written statement are made by the same mechanical operation, the first impression and others may be regarded as duplicate originals. *Brenner* v. *Lesher,* 332 Pa. 522, 2 A.2d 731. Duplicate or triplicate originals made with the same stroke of the pen or typewriter as the original are admissible as primary evidence. *Campbell* v. *Pure Oil Co.,* 92 Ga. App. 523, 88 S.E.2d 630.

We believe that the following statement is particularly apropos to the questioned delivery receipts:

> "In the case of duplicate originals or counterparts each duplicate original or counterpart is admissible as primary evidence. The rule is particularly applicable to copies produced by the same mechanical operation, such as carbon, impression, printing press and manifold copies. If, however, some but not all carbon copies are signed, the unsigned copies become secondary evidence." 32A, C.J.S., Evidence, §821, p. 160.

The manager of defendant's Rhode Island terminal, in describing these two documents, stated each was a part of a progressive waybill. He stated that the waybill consisted of between nine and ten parts and originated in Chicago. He pointed out that the sixth copy would be sent to defendant's accounting department while the second and third

312

copies accompanied the shipment. He produced the original of the waybill sent with the August 10 shipment. This document, which also bears the clerk's signature, contains a notation as to the damaged carton.

From an examination of the delivery receipts, the original of the August 10 waybill, and the testimony of the terminal manager, we are of the opinion that the two delivery receipts are duplicate originals of the August 1 waybill and not copies as is argued by plaintiff. Bearing as they do the signature of plaintiff's shipping clerk, these two receipts were properly admitted into evidence.

The plaintiff's exceptions to the trial justice's decision and his admission into evidence of the delivery receipts are hereby overruled. The plaintiff has briefed and argued other exceptions which, because of the conclusion herein, are not germane and they are hereby overruled pro forma.

The plaintiff's appeal is denied and dismissed, and the case is remitted to the superior court for entry of judgment.

*Temkin, Merolla & Zurier, Amedeo C. Merolla,* for plaintiff.

*Winograd, Winograd & Marcus, Allan M. Shine,* for defendant.